## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

```
-------------------------------------------------------------X
                                                 :
(1)ARTHUR ALBERTS, Individually and              :
derivatively on behalf of CHESAPEAKE             :
ENERGY CORPORATION,                              :
                                                 :   CASE NO. CIV-12-545-F
        Plaintiff,                    :
                                                 :
    -against-                                    :
                                                 :
(1)AUBREY K. McCLENDON, (2)RICHARD K.            :
DAVIDSON, (3)KATHLEEN M. EISBRENNER,             :
(4)V. BURNS HARGIS, (5)FRANK KEATING,            :
(6)CHARLES T. MAXWELL,(7) MERRILL A.             :
MILLER, JR., (8)DON L. NICKLES, and              :
(9)LOU SIMPSON,                                  :
                                                 :
        Defendants,                              :
                                                 :
        –and–                                    :
                                                 :
(1)CHESAPEAKE ENERGY CORPORATION,                :
an Oklahoma Corporation                          :
                                                 :
        Nominal Defendant.                       :
                                                 :
-------------------------------------------------------------X
```

## SHAREHOLDER'S DIRECT AND DERIVATIVE COMPLAINT

Plaintiff, Arthur Alberts ("Plaintiff"), by his undersigned attorneys, for his complaint against

defendants, alleges the following upon information and belief except as to himself and his own acts

which is alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    This is a stockholder's derivative action brought under Fed. R. Civ. P. 23.1 by a

stockholder of Chesapeake Energy Corporation ("Chesapeake" or the "Company"), in the name and

for the benefit of the Company, against the members of Chesapeake's Board of Directors to remedy the damages caused by their wrongful conduct.

2.  As set forth in greater detail below, the Individual Defendants negligently, recklessly or intentionally failed to properly disclose significant aspects of the Company's business which have caused and/or threatened to cause substantial losses to the Company, corporate waste and other damages, as described below.

3.  This case arises out of the operation of the Founder's Well Participation Program ("FWPP") and the significant benefits realized thereunder by the Company's founder, CEO and Chairman, McClendon. The FWPP permits McClendon to purchase a 2.5% interest in Chesapeake wells. Each year, McClendon must elect to invest in all wells being developed by the Company or none. At all times relevant to this action, McClendon has elected to invest in every well. As a participating owner in each well, McClendon is required to put up his pro rata share of development and operating costs. Because significant costs are expended before any income is realized, many of McClendon's FWPP investments are underwater.

4.  Federal law requires that the Company's various public disclosures must detail all related party transactions such as the operation of the FWPP, and all actual and potential conflicts of interest that have or may arise therefrom. The Individual Defendants are well aware of their obligations to insure that the Company's public disclosures on this and all other topics are full and complete.

5.  The Individual Defendants, however, have failed to fulfill this obligation. On April 18, 2012, the Reuters news agency reported that McClendon (both directly and through companies he controlled) had secured up to $1.1 billion in loans to fund his participation in the FWPP. As security for the loans, McClendon pledged his interests in the FWPP wells. The sources of these loans

included, among others, EIG Global Partners, a private equity firm simultaneously heavily involved in financial deals with Chesapeake. It is self-evident that McClendon's personal loans from EIG and his continued reliance on EIG for personal financing creates a significant conflict of interest for him to pursue the best financing terms from EIG on behalf of Chesapeake. Indeed, since the disclosure of this conflict, some investment analysts have suggested that EIG received sweetheart terms on some of its financing deals with Chesapeake. Furthermore, McClendon's heavy leveraging of his obligations under the FWPP undermine the avowed basis of the program – to align the financial interest of McClendon with those of the Company's shareholders in developing the Company's wells. Until this report, shareholders had no knowledge that McClendon had little or no true personal risk in any of his FWPP investments.

6.   Following this disclosure, Chesapeake shares dropped approximately 5.5%, representing a plunge in market value of over $500 million. Predictably, the Company now faces class action securities fraud lawsuits based on this situation which expose the Company to liability in the hundreds of millions of dollars.

7.   The negative ramifications for Chesapeake and its shareholders as a result of defendants' wrongdoing have been enormous and will continue to impact the Company for years to come.

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the claims herein arise under Section 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 thereunder (17 C.F.R. §240.14a-9). This Court also has jurisdiction under 28 U.S.C. §1367 as to the state law claims pled herein in that they arise out of the same transactions and occurrences as the federal claims. Furthermore, the Court has jurisdiction under 28 U.S.C. §1332 in that the plaintiff and defendants

in this action are all citizens of different states and the matter in controversy exceeds the sum or value of $50,000, exclusive of interests and units.

9.  Venue is proper in this District pursuant to 28 U.S.C. §1391(a) in that the acts complained of in this action occurred in substantial part in this District and Chesapeake maintains its principal place of business in this District.

10. The portion of this action brought derivatively is subject to Rule 23.1 of the F.R.C.P. This action is not brought collusively to confer jurisdiction on this or any other court of the United States.

## THE PARTIES

11.   Plaintiff Arthur Alberts owns Chesapeake shares and has owned such shares at all relevant times.

12.   Nominal defendant Chesapeake is a public company engaged in oil and gas exploration. Chesapeake is an Oklahoma corporation which maintains its principal executive offices at 6100 North Western Avenue, Oklahoma City, OK 73118. Chesapeake issued a Proxy Statement on or about April 29, 2011 but has not yet issued a final 2012 proxy statement. No monetary relief is sought from nominal defendant Chesapeake and, except where otherwise indicated, the use of the terms "defendant" or "defendants" does not include Chesapeake.

13.   Defendants Aubrey K. McClendon, Richard K. Davidson, Kathleen M. Eisbrenner, V. Burns Hargis, Frank Keating, Charles T. Maxwell, Merrill A. Miller, Jr., Don L. Nickles, and Lou Simpson served at relevant times as directors of Chesapeake. In addition, defendant McClendon has also served as Chairman of the Board and Chief Executive Officer since co-founding the Company in 1989. The foregoing defendants are herein referred to collectively as the "Individual Defendants

4

14.   Each of the Individual Defendants, because of his or her position as a director and/or senior officer of the Company, owed fiduciary duties to the Company and its shareholders in connection with the operations, management and direction of Chesapeake.

15.   To discharge these duties, the Individual Defendants were required, among other things:

(a) to manage, conduct, supervise and direct the employees, businesses and affairs of Chesapeake in accordance with state and federal laws, rules and regulations and the charter and by-laws of the Company;

(b) to ensure the prudence and soundness of Chesapeake policies and practices, including regulatory compliance and practices undertaken or proposed to be undertaken by the Company;

(c) to make timely and accurate disclosures concerning the operation and prospects of Chesapeake all in accordance with relevant federal law and regulations; and

(d) to remain informed as to how Chesapeake was in fact operating and, upon receiving notice or information of imprudent or unsound practices or inadequate disclosures, to make an appropriate, thorough investigation in connection therewith and to take steps to correct the condition or practice and/or any related public disclosures.

16.   Each defendant herein is sued individually as a conspirator or aider and abettor as well as, in the case of the Individual Defendants, in their individual capacity as directors and/or officers of Chesapeake. The liability of each arises from the fact that they have caused or engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein and were necessary and indispensable to the consummation of the wrongs.

17.   The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements disseminated by Chesapeake.   Negligently, in reckless disregard of the truth or with knowledge of the falsity of the statements contained therein, the Individual Defendants caused the public dissemination of misstatements and omissions of material fact about Chesapeake generally and the FWPP in particular, and knowingly, recklessly or negligently failed in their duty to update or correct misleading statements issued by Chesapeake.

## SUBSTANTIVE ALLEGATIONS

18. Defendant McClendon co-founded Chesapeake in 1989.

19. Chesapeake owns interests in over 45,000 producing natural gas and oil wells.

20. From its inception forward, the Company sold leasehold interests in drilling prospects it had developed to Chesapeake's founders and third parties rather than incurring the risks of developing the properties itself. This founder's participation program was first formalized and incorporated into the founders' employment agreements created in association with Chesapeake's February 1993 IPO. The Company's directors viewed the participation program as a means of insuring that the founder's personal interests aligned closely with those of the Company and its shareholders. The directors perceived this alignment was likely to be stronger through this cost-sharing program than earnings-based bonus pools.

21. For every well in which a founder obtained an interest, Chesapeake billed the founder from time to time for the founder's *pro rata* share of the well's leasehold, drilling and operating costs. Revenue from the wells were divided in the same proportion less Chesapeake's marketing costs.

22. Except for the period January 1, 1999 through March 31, 2000, the founders participated in all eligible wells from the February 1993 IPO through 2005.

23. In 2005 the Company further formalized this program by seeking shareholder approval of the FWPP. The shareholders voted to approve the program through 2015. Among other things, the FWPP the shareholders approved limited the founder's participation percentage to 2.5% and excluded wells in which the Company's interest was less than 12.5% or would be rendered so as a result of the founder's election. Once set, the program does not permit the founder's percentage to be adjusted without the prior written consent of the Compensation Committee.

24. Although the FWPP adopted by the shareholders was silent on the means the founders would obtain the participation investments required under the program, the FWPP did purport to align the founders' financial interests with those of Chesapeake.

25. In 2006 McClendon's co-founder left the FWPP, leaving McClendon as the sole participant.

26. Since the 2005 adoption of the FWPP, McClendon's personal financial dealings have from time to time had a significant adverse effect on the Company. Before 2008, McClendon bought substantial amounts of Chesapeake stock on margin. When Chesapeake shares tanked during the 2008 financial crisis, McClendon's margin loans were called and he was forced to sell nearly $570 million in stock to meet margin calls, with a predictably adverse effect on Chesapeake's share price. The Company's stock price dropped nearly 40 percent during the week of McClendon's forced sales. As with this more recent incident, McClendon's margin borrowing and subsequent sales led to shareholder suits against the Company.

27. In order to finance his obligations under the FWPP, McClendon needed to replace the margin loans with other financing. Unbeknownst to shareholders or the investing public, McClendon secured loans from a number of different lenders pledging his founder's interest in the FWPP wells.

These loans include: $225 million from Union Bank in 2009; $375 million from TCW Asset Management in 2010; and $500 million from EIG Global Energy Partners in January of this year.

28. EIG was also involved in transactions done by Chesapeake, an obvious conflict of interest. Its relationship with McClendon personally appears to date back to at least 2009. Through certain special purpose entities EIG created, EIG obtained the rights to McClendon's 2009-2012 well stakes in exchange for funding McClendon's payment obligations under the FWPP. Apparently, EIG has reaped handsome rewards from these arrangements.

29. At the same time, Chesapeake has concluded financing deals with EIG and other investment banks and hedge funds. Many of these arrangements actually passed title to Chesapeake's reserves to the financing entities so that, in the event of a Chesapeake bankruptcy, such assets will be beyond the reach of any other creditors. Press reports have also indicated that Chesapeake has been overproducing these and other wells in order to meet the production targets of the banks.

30. The conflicts arising from these entangled relationships are obvious. McClendon is personally beholden to EIG and may well be compromised in the decisions he makes on Chesapeake's behalf where EIG's interests are implicated. For example, basic decisions about how to operate the wells, generate cash flow and how aggressively to deal with EIG on Chesapeake's behalf may turn as much on McClendon's self interest and EIG's wishes as on what is good for Chesapeake. In recent weeks, the disclosure of these loans have led some analysts to opine that EIG has disproportionately benefited from its Chesapeake transactions.

31. All of these potential conflicts are multiplied in the event McClendon defaults on some or all of his personal obligations to EIG. At a minimum, these previously undisclosed personal loans clearly frustrate the avowed purpose of the FWPP – to align McClendon's personal financial interest

with that of Chesapeake – since McClendon appears to have off-loaded all of the financial risks of his participation in the FWPP to third party financiers like EIG.

## DERIVATIVE ALLEGATIONS

32.   Plaintiffs bring Counts II - IV below derivatively in the right of and for the benefit of Chesapeake to redress injuries suffered and to be suffered by it as a direct result of defendants' wrongdoings. Unless otherwise stated, each of the allegations in this section of the Complaint relate to the derivative counts.

33.   Plaintiff will adequately and fairly represent the interests of Chesapeake and its stockholders in enforcing and prosecuting their rights. This action is brought to remedy violations of applicable law as set forth herein.

34.  Plaintiffs have not made any demand on the present board of directors of Chesapeake to institute this action because such demand would be a futile and useless act for at least the following reasons:

(a)  Defendants participated in or approved the acts or omissions or recklessly disregarded the wrongs which are complained of herein.  The Individual Defendants knew of or, in the exercise of reasonable diligence, would have known of the actual and potential conflicts of interest resulting from McClendon's loans and the FWPP but failed to disclose them as required by law. The Individual Defendants thus face a substantial likelihood of being held liable and cannot independently evaluate a demand that the Company bring suit against themselves.

(b) Each of the Company's directors participated in, acquiesced in, and approved the wrongs alleged herein, and did  so in affirmative violation of their duties to Chesapeake and its stockholders and have permitted the wrongs alleged and/or have remained inactive although they had

9

knowledge or notice of those wrongs. Indeed, after public disclosure of the situtation on April 18, 2012, the Individual Defendants not only failed to act on behalf of the Company but caused Chesapeake's General Counsel to prematurely (and incorrectly) announce that no disclosures were or will be necessary with respect to McClendon's loans and the FWPP.

(c) The misleading and incomplete announcements with respect to the related party transactions here are violations of federal law and regulations and therefore cannot be a reasonable exercise of business judgment. As such, the Individual Defendants cannot ratify the wrongful conduct at issue here and demand by plaintiff in this action is excused as futile.

35.  As a result of the wrongful conduct of the Individual Defendants, Chesapeake already faces substantial potential liability in the class action securities fraud civil suits that have already been filed as a result of these disclosure violations. This is over and above any excessive loan costs Chesapeake paid as a result of McClendon's conflicts with the Company's lenders.

## COUNT I
## Direct Claim Under Federal Proxy Statute and Regulations

36.  Plaintiff realleges and incorporates by reference each and every allegation contained above.

37. Section 14(a) of the Exchange Act and Rule 14a-9 thereunder provide that Defendants were required to ensure that the Company's Proxy Statements contained full, fair and accurate disclosures and did not omit material facts necessary to make the disclosures therein not misleading.

38. As more fully set forth herein, the Company's 2011 Proxy Statement, prepared under the direction of the Individual Defendants, violated the foregoing proxy standards.

39. Plaintiff is entitled to a judgment that the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder and an award of declarative, injunctive and/or monetary relief necessary to remedy this violation.

## COUNT II
### Derivative Claim Under Federal Proxy Statute and Regulations

40.   Plaintiff realleges and incorporates by reference each and every allegation contained above.

41. Section 14(a) of the Exchange Act and Rule 14a-9 thereunder provide that Defendants were required to ensure that the Company's Proxy Statements contained full, fair and accurate disclosures and did not omit material facts necessary to make the disclosures therein not misleading.

42. As more fully set forth herein, the Company's 2011 Proxy Statement, prepared under the direction of the Individual Defendants, violated the foregoing proxy standards.

43. Plaintiff is entitled to a judgment that the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder and an award derivatively on behalf of the Company of declarative, injunctive and/or monetary relief necessary to remedy this violation.

## COUNT III
### Derivative Claim For Breach of Fiduciary Duty

44. Plaintiff realleges and incorporates by reference each and every allegation contained above.

45. This Claim is brought derivatively by plaintiffs on behalf of Chesapeake against the Individual Defendants.

46. The Individual Defendants are fiduciaries of Chesapeake and of all of its public stockholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently.

47. Here the Individual Defendants failed to act in good faith and consciously disregarded their disclosure obligations by failing to insure that the Company properly disclosed McClendon's related party transactions, the effect those loan transactions had on the avowed purposes of the FWPP and the conflicts of interest resulting therefrom, all in violation of the foregoing legal standards.

48. As a result of the Individual Defendants' wrongful conduct and actions, Chesapeake has suffered considerable damage to and drastic diminution in the value of its assets and stock. The Individual Defendants must account to Chesapeake for the damages suffered or to be suffered by the Company as a result of these breaches of their fiduciary duty.

49. The Individual Defendants have been responsible for the gross mismanagement of Chesapeake.  The Individual Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

(a) They caused Chesapeake to violate the federal securities laws and related principles of common law;

(b) They concealed from the Company's stockholders as well as the investing public the truth about McClendon's related party transactions, the effect those loan transactions had on the avowed purposes of the FWPP and the conflicts of interest resulting therefrom;

(c) They subjected Chesapeake to adverse publicity, thereby impairing its good will and relationships with the Company's business partners and customers; and

(d) They caused the Company to make business decisions based on false, misleading and inadequate information regarding McClendon's related party transactions, the effect those loan transactions had on the avowed purposes of the FWPP and the conflicts of interest resulting therefrom

50. All the Individual Defendants, singly and in concert, engaged in the aforesaid conduct in grossly negligent and/or reckless disregard of their fiduciary duties to the Company.

51. The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

52. In the event that the plaintiffs in the securities fraud actions, or the plaintiffs in any similar actions, recover any substantial amounts from Chesapeake, it will be as a result of the Individual Defendants' misconduct and breaches of fiduciary duty.

53. At all times relevant herein, the Individual Defendants occupied fiduciary positions with Chesapeake that made them privy to confidential material inside information concerning Chesapeake and its operations, including the misrepresentations and omissions referred to herein, senior management's knowledge or reckless disregard thereof and Chesapeake's resulting exposure to injury and liability in the pending securities fraud actions.

54. By reason of the foregoing, the Individual Defendants have breached their fiduciary obligations to Chesapeake and its stockholders.

55. Chesapeake and its stockholders have been injured by reason of the Individual Defendants' grossly negligent breach and/or reckless disregard of their fiduciary duties to the Company. The Individual Defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care which they as directors and senior executives owed to Chesapeake and,

in bad faith, have wrongfully breached and/or aided and abetted breaches of fiduciary duties to Chesapeake. Plaintiffs, as stockholders and derivative representatives of Chesapeake, seeks damages and other relief for the Company as hereinafter set forth.

### COUNT IV
### Derivative Claim For Contribution and Indemnification

56. Plaintiff realleges and incorporates by reference each and every allegation contained above.

57. This Claim is brought derivatively by plaintiffs on behalf of Chesapeake against the Individual Defendants.

58. Chesapeake is alleged to be liable to plaintiffs in certain pending securities fraud actions for the disclosure violations set forth herein. In the event Chesapeake is found liable to those persons for violating the federal securities laws or other laws, Chesapeake's liability will arise, in whole or in part, from the intentional, knowing, reckless grossly negligent acts or omissions of the Individual Defendants as alleged herein, and Chesapeake will be entitled to receive contribution from the Individual Defendants

WHEREFORE, plaintiffs demand judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in plaintiff's favor and in favor of the Company, as appropriate, against all defendants as follows:

(a) Authorizing the maintenance of this action as a derivative action, with plaintiff as derivative plaintiff;

(b) Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

(c) Declaring the the Individual Defendants have violated the federal proxy laws and regulations as more fully set forth herein;

(d) Enjoining the Individual Defendants against commiting further disclosure violations and further ordering the Individual Defendants to make full, accurate and complete disclosures regarding the matters set forth herein.

(e) Against each Individual Defendant for recoupment of all fines, penalties and/or damages paid or to be paid by Chesapeake as a result of the wrongful conduct alleged herein, including pre-judgment interest and directing that, in the event that Chesapeake is found liable to plaintiffs and the putative class in the pending federal securities class actions, Chesapeake is entitled to contribution and/or indemnification from the Individual Defendants;

(f) Ordering Chesapeake to implement effective internal control mechanisms and corporate governance policies and procedures designed to insure Chesapeake's compliance with federal proxy laws and regulations;

(g) Awarding plaintiff the costs and disbursements of this action, including reasonable allowances for plaintiff's attorneys' and experts' fees and litigation expenses; and

(h) Granting such other or further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Dated: May 8, 2012

**LAW OFFICES OF DELLUOMO & CROW**

By:    /s/Steven W. Crow
           Daniel M. Delluomo
           Steven W. Crow
           5617 N. Classen Blvd.
           Oklahoma City, OK 73118
           (405) 843-0400

**DAVID B.  KAHN  &  ASSOCIATES,  LTD.**
           David B.  Kahn
           Mark E.  King
One Northfield Plaza, Suite 214
Northfield, Illinois 60093
(847)-501-5083